**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Guy F. PARKER, Defendant-Appellant.**

**No. 18129.**

United States Court of Appeals, Seventh Circuit.

Aug. 10, 1971.

William A. Barnett, Gerald C. Risner, Chicago, Ill., for defendant-appellant.

William J. Bauer, U. S. Atty., Richard M. Williams, Asst. U. S. Atty., Chicago, Ill., for plaintiff-appellee, John Peter Lulinski, Jeffrey Cole, Asst. U. S. Attys., of counsel.

Before SWYGERT, Chief Judge, and FAIRCHILD and STEVENS, Circuit Judges.

STEVENS, Circuit Judge.

Appellant retired from the Internal Revenue Service in 1965 at the age of 63. On January 16, 1969, he testified as a defense witness at the trial of Jack W. Baum. As a result of that testimony, a nine-count perjury indictment was returned against him on January 28, 1969. The judge who had presided at the Baum trial also conducted appellant's trial. The jury found him guilty on Counts III and IV and not guilty on the other seven counts; the judge sentenced him to imprisonment for three years.

Each of the nine counts of perjury charged a conflict between testimony given by appellant on cross-examination in the Baum trial and statements which

**828**

he made on June 27, 1967, to Inspectors Weber and Pazdziora, who were then investigating alleged irregularities in an audit examination he had conducted in 1961. The audit involved returns for certain clients of Baum, an attorney, and was conducted in Baum's offices. It had been alleged, in substance, that appellant had found an aggregate deficiency of about $20,000 for the years 1958, 1959 and 1960, which, together with other circumstances, warranted a 50% fraud penalty. Baum allegedly had caused appellant not to make a fraud referral by giving him false information to include in his report and offering him a bribe of $3,000.

The principal false information given to appellant was Baum's explanation of the understatement of income; Baum had said the taxpayer, a masonry contractor, had incorrectly set up a contingent liability for pending litigation relating to certain jobs. There was no basis in fact for this explanation. The Government contended, in both the Baum trial and in appellant's perjury trial, that ordinary diligence would have revealed the fraud and that appellant had deliberately prepared a false Revenue Agent's Report.

We recently affirmed Baum's conviction. United States v. Baum, 435 F.2d 1197 (7th Cir. 1970). There were three counts to Baum's indictment: (1) conspiracy to evade his clients' taxes; (2) an attempt to bribe appellant; and (3) the procurement of a false Revenue Agent's Report. Baum was convicted on the first and third counts but found not guilty of the attempted bribery. Appellant and one Samuel Carmel, an associate of Baum's, were named as co-defendants on the conspiracy count, but were severed; as far as the record here discloses, appellant has never been tried on that charge and, therefore, still retains his presumption of innocence (which, of course, is consistent with the jury's acquittal of Baum on the Count II charge of attempted bribery).

At the Baum trial appellant's direct testimony was quite brief. He stated that he had conducted the audit in Baum's office during the summer of 1961. On one hot day, Carmel (Baum's alleged co-conspirator) invited him into an air-conditioned private office and offered him a short term interest free loan to buy some stock that was sure to increase in value promptly. He construed the conversation as a bribe overture; he replied to the overture by stating that he would think it over; later, according to his testimony, he reported the incident orally to his superior.[1] He denied that Baum ever offered him money.

There were two parts to the cross-examination of appellant. The first was clearly within the scope of the direct examination. In that part of his cross, appellant acknowledged that he considered Carmel's proposal as an overture to a bribe and that he suspected Carmel to be an intermediary for Baum.

Thereafter Baum's lawyer objected to additional questions as going beyond the scope of the direct examination. The court stated: "The scope is as wide open as this case is, counsel, * * * he may inquire into any fact in this case." The prosecutor then asked the series of questions that gave rise to the perjury indictment. Count III charged that appellant falsely "testified in substance that during an interview with two Inspectors of the Internal Revenue Service on June 27, 1967, he did not state that possibly Jack W. Baum told him not to make a fraud referral."

Count IV charged that he falsely testified in substance that during the same interview "he did not say 'How else could I have arrived at a figure of omitted income if I didn't specifically identify the jobs involved?'"

This appeal raises a number of questions, including ultimately the question whether the error in the record is of sufficient importance to require a new trial.

1. E. J. Bourgeois, who did not testify in either trial.

## I.

■ The perjury indictment was returned less than two weeks after appellant testified at the Baum trial. The indictment was assigned to the same judge who presided at that trial upon the suggestion of the Government that the two cases were related. Defendant's motion to have the perjury case transferred to the Executive Committee for reassignment to a different judge was denied.

■ We accept the district court's construction of the applicable rules for the control of its calendar as then in effect,[2] and find no error in the denial of the motion. We believe, however, that the fact that the assignment procedure enabled the prosecutor to select a judge who may have been persuaded of appellant's guilt before the trial started is a factor we must take into account in weighing the significance of any error committed during the course of the trial.

After the perjury trial, the jury found appellant guilty on only two of the nine counts; the Judge, however, was convinced that he was guilty on all nine counts.[3] He had witnessed appellant's testimony in the Baum trial and may well have formed his opinion of appellant's guilt at that time. Although we neither hold nor imply that this would disable him from conducting the perjury trial in a fair and impartial manner, inevitably it created the risk that the accused's presumption of innocence might be undermined by an inadvertent comment by the court, or by unintended bias in the exercise of discretion on evidentiary or other rulings. In these circumstances, we believe it would have been better practice to forestall the charge of bias, or appearance thereof, by sending the case back to the Executive Committee for reassignment. The failure to do so, although not error, increased the risk of prejudice to the accused.[4]

## II.

Appellant contends that the alleged false statements were not "material"

2. The amendment to Rule 10(B) (4) (a) of the General Rules of the District Court for the Northern District of Illinois adopted on November 17, 1969, would have required reassignment if the motion had been filed after that date since Baum was not a defendant in this case.

3. "* * * and there was just no question at all in my mind, and the fact that the jury found him guilty of only seven out of nine counts indicates that they may have had some problem on the others, but they had no problem on—
    "Mr. Barnett: Two out of the nine.
    * * *
    "The Court: All right. Two out of nine, whatever it was. It indicated that, as to the two counts at least, that they had no problem.
    "Mr. Barnett: Your Honor—
    "The Court: I had no problem on any of them, on the fact that the agents involved—it was an unusual case because of the fact that subsequent to the interview with them they went back to the office and made a very detailed statement item-by-item. It was written out and no one depended on their recollection, their independent recollection, it was down there in black and white. He took the witness stand and denied making practically each one of the statements. Now,

if there was ever perjury, that was it.
* * * " (A. 184–85)

4. Although we do not hold that the refusal to retransfer the case was error under then prevailing practice, we note that the recent recommendations of the American Bar Association Special Committee on Standards of Judicial Conduct may require a significant re-examination of existing procedure. Proposed Canon 2(c) not only states that a judge should disqualify himself if he has "personal knowledge of evidentary facts" (as in this case, since the judge had witnessed the alleged perjury), but also may require criminal cases which have been remanded for a new trial to be heard by a different judge. The broad language of the proposed canon refers to "any proceeding in which his impartiality might reasonably be questioned" and specifically includes cases in which he "has a fixed belief concerning the merits of the matter before him." Having heard evidence which satisfied a jury of a defendant's guilt beyond a reasonable doubt, the judge sitting at the second trial might well have such a fixed belief concerning the merits. Accordingly, he should give serious consideration to the question whether his presiding at a retrial would create at least an appearance of prejudice.

within the meaning of the federal perjury statute.[5]

■ Materiality is a question for the court, not the jury, to decide. United States v. Rivera, 448 F.2d 757 (7th Cir. 1971). We do not know the basis of the trial judge's determination of materiality since he simply indicated that he was familiar with the Baum trial. The Government, however, predicates its claim of materiality on its right to impeach a witness by proving prior inconsistent statements. We agree with the Government that if the statements which appellant made to Inspectors Weber and Pazdziora on June 27, 1967, were inconsistent with his direct testimony at the Baum trial on January 16, 1969, a false denial, on cross-examination, that he had made those statements would clearly be "material" within the meaning of the statute.

We do not find any inconsistency between the two statements to the Inspectors which, according to Counts III and IV, appellant falsely denied, and his direct testimony. He could have admitted that Baum had possibly asked him not to make a fraud referral and that he had determined the amount of omitted income by specifically identifying the jobs involved without compromising his direct testimony at all. The Government claims that there is an inconsistency with the thrust of the direct testimony, which tended to implicate Carmel, and thereby impliedly to exonerate Baum from responsibility for the bribe overture. This argument falls, however, because prior to any reference to the interview with the Inspectors, appellant had acknowledged that he thought Carmel was an intermediary for Baum. We do not accept the Government's argument that Counts III and IV charge false denials of prior inconsistent statements.

■■ As we understand the perjury statute, however, the requirement that the false matter be "material" does not mean that a defendant may excuse false testimony on the ground that an objection to its admissibility should have been sustained. Thus, even if we assume, without deciding, that the court should not have permitted the cross-examination of appellant to go beyond Baum's narrow interpretation of appellant's direct testimony, once the court had ruled that the question was proper, the witness had a duty to respond truthfully. Cf., United States v. Manfredonia, 414 F.2d 760 (2nd Cir. 1969).

■ The subject matter of Counts III and IV, even if not material to appellant's direct testimony, were certainly material to critical issues in the Baum litigation. An admission by appellant that Baum had possibly asked him not to make a fraud referral would have tended to prove Baum's guilt; an admission that he specifically identified the jobs involved in the understatement of income would have tended to prove the conspiracy charge because it would have evidenced knowledge of the fraudulent character of Baum's explanation for the erroneous returns. The alleged false testimony had a tendency to influence the trier of facts in the case on trial and was, therefore, material within the meaning of the perjury statute. United States v. Mitchell, 417 F.2d 1246, 1248–1249 (7th Cir. 1969).

### III.

Appellant offered to prove his reputation for honesty and integrity through the testimony of two group supervisors of the Internal Revenue Service and two agents. The witnesses were qualified to testify to appellant's reputation in the

5. "Whoever, having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true, is guilty of perjury, and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. * * *" 18 U.S.C. § 1621.

community in which he had been employed for many years, but not to his reputation in the community in which he resided. The court sustained the prosecutor's objection to this line of proof.[6]

■ As the Government correctly points out, there is language in the Supreme Court's opinion in Michelson v. United States, 335 U.S. 469, 69 S.Ct. 213, 93 L.Ed. 168, which may be read to require a character witness to know the defendant's reputation in the community in which he lives.[7] We believe, however, that the Court's reference to "the community in which he has lived and the circles in which he has moved" is broad enough to encompass the circles in which a defendant has been employed, as well as his social relationships. In today's complex urban society, a man's reputation among co-workers may well be more significant than his reputation among neighbors, particularly if they are apartment dwellers. Although the Government's position is not without support,[8] we believe the better rule is that "the testimony may extend to the reputation of the witness for truth and veracity in the community where he works as well as that in which he has his home." State v. Axilrod, 248 Minn. 204, 79 N.W.2d 677, 682 (1956).[9]

■ We hold that it was error to exclude the proffered evidence of appellant's reputation among other members of the Internal Revenue Service.

## IV.

■ Count III charged that appellant falsely denied that he had admitted to the Inspectors that possibly Baum had told him not to make a "fraud referral." It was, therefore, appropriate to explain that term to the jury. The prosecutor, however, went well beyond an explanation of that term. He tried to convince the jury that appellant was guilty of not making a fraud referral which was plain-

6. "Mr. Makarski: Your Honor, I object. The law is clear that the good character can only be brought out from the community in which the person resides. There is no foundation that he lives in the same community.

"Specifically, the Michelson case in the Supreme Court said you cannot limit it to conditions such as work. The law is clear." (A. 132.)

7. "The witness is, however, allowed to summarize what he has heard in the community, although much of it may have been said by persons less qualified to judge than himself. The evidence which the law permits is not as to the personality of defendant but as to the shadow his daily life has cast in his neighborhood." 335 U.S. at 477, 69 S.Ct. at 219.

"However, the witness must qualify to give an opinion by showing such acquaintance with the defendant, the community in which he has lived and the circles in which he has moved, as to speak with authority of the terms in which generally he is regarded." 335 U.S. at 478, 69 S.Ct. at 219.

8. See United States v. Pincourt, 159 F.2d 917, 920 (3rd Cir. 1947); see also Alverez v. United States, 282 F.2d 435, 438 (9th Cir. 1960).

In United States v. Battaglia, 394 F.2d 304, 316 (7th Cir. 1968), vacated on other grounds, Battaglia v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, and Evans v. United States, 394 U.S. 310, 89 S.Ct. 1163, 22 L.Ed.2d 297, this court declined to disturb the trial court's ruling excluding testimony of four defense character witnesses. Though the Government has not relied on that case here, there is language in the majority opinion which supports its position. See also Kroot v. United States, 66 F.2d 449, 450–451 (7th Cir. 1933). Battaglia, however, did not establish an absolute rule excluding all business reputation testimony; such a rule is dictated neither by precedent nor reason.

9. V Wigmore on Evidence, (3rd ed.) § 1616; see, e. g., People v. Kronk, 326 Mich. 744, 40 N.W.2d 788 (1950); State v. Jackson, 373 S.W.2d 4, 8–9 (Sup.Ct. Mo.1963); People v. Cobb, 45 Cal.2d 158, 287 P.2d 752, 755 (1955) (en banc); see also United States v. Salazar, 425 F.2d 1284–1286 (9th Cir. 1970); Whiting v. United States, 296 F.2d 512, 517 (1st Cir. 1961). The Proposed Rules of Evidence for the United States Courts and Magistrates (revised draft March, 1971) seem to adopt an approach to proof of character which completely eschews the concept of community reputation. See Proposed Rule 405 and Advisory Committee's Note thereto.

ly required by the normal procedures of the Internal Revenue Service in view of the discovery of a tax deficiency as large as $20,000. Thereafter, defendant sought to respond by proving that a Government witness had misdescribed the fraud referral procedure, and that the amount of omitted income in relation to taxpayer's gross income was not sufficient to make a fraud referral mandatory.[10] The court sustained the prosecutor's objections to this line of proof.

■ Although the trial judge has broad discretion when ruling on the relevance of proffered evidence, it is imperative that on any given issue the same standard be applied to both parties. It was error to give the prosecutor enough latitude to develop his fraud referral contention while applying a narrower standard of relevance to appellant's attempt to make a fair response to that contention.

## V.

Appellant also challenges the sufficiency of the evidence, the instructions to the jury, and some of the comments of the prosecutor and the court as unduly prejudicial.

■ If the jury believed the testimony of Inspectors Weber and Pazdziora, there was adequate evidence of guilt. Contrary to appellant's argument, we find no ambiguity in his categorical denial of the statements referred to in Counts III and IV. We are also satisfied that the jury was properly instructed.[11]

With one exception, the challenged comments relate to matters we have already discussed or were of minor significance when read in context. That exception related to the written memorandum prepared by Weber and Pazdziora of their interview with appellant on June 27, 1967.

When appellant was on the witness stand at the Baum trial he had first placed the date of that interview in July. His recollection as to the date was refreshed by showing him the memorandum. He, therefore, knew of the existence of the document and had seen it, but except for a glance at the date he had not read it. The prosecutor had not attempted to refresh his recollection by permitting him to review the specific statements about which the prosecutor inquired.

In the perjury trial, in closing argument, the prosecutor stated that before appellant perjured himself "he was offered the memorandum which was discussed here, prepared by Weber and Pazdziora." Appellant's counsel objected, whereupon the court stated that the record indicated that the memorandum had been proffered to him. In fact, only the date appears to have been shown to appellant and, as we understand the record, neither he nor his counsel was permitted to review its text before he testified. The memorandum was obviously of importance on the issue of appellant's knowledge of the falsity of his testimony. A fair statement of its availability to the witness should, therefore have been made.

---

10. Appellant offered to prove through two Internal Revenue Service Agents that fraud referral was a matter of judgment; that such referral was not mandatory even if there was a 25% understatement of income; and that the significance of the 25% figure was that such an understatement permitted (though it did not require) examination of returns which would otherwise be foreclosed. Appellant offered copies of taxpayer's returns for 1958, 1959 and 1960 showing gross income of $383,520.00, $427,881.37 and $403,873.40 for those years respectively. The court excluded the offered exhibits although they would have clearly established that the omitted income was much less than 25% of the taxpayer's gross income.

11. Appellant's strongest argument is that the instructions should have separated more clearly the elements of false testimony and knowledge of the falsity. These two elements were identified by the court's reference to the statutory language and by the explanation of the term "knowingly" as well as the additional explanation of "wilfully."

Viewing the record as a whole, we have concluded that the errors we have identified were of sufficient importance to require a new trial. We also believe that the prosecutor should not retain any possible advantage resulting from his selection of a particular judge with personal knowledge of critical evidentiary facts.

The judgment is reversed and the case is remanded with instructions to transfer it to the Executive Committee for reassignment.